KING, Justice,
for the Court:
¶ 1. As a result of Hurricane Katrina, the Mississippi Windstorm Underwriting Association (MWUA) sustained great losses well in excess of its reinsurance. MWUA assessed its members to cover the loss. Members are required to share in MWUA’s expenses, profits, and losses based on their percentages of wind and hail insurance premiums written in the previous calendar year. After the initial assessments, several member companies complained that they had incorrectly reported the previous year’s figures. The Board of Directors gave the members a one-time opportunity to submit corrected data — a true-up.
¶ 2. Thereafter, some members (most of whom did not submit corrected data) appealed the assessment following the true-up. The Board denied their appeals. The members appealed their claims to the Insurance Commissioner, and the Commissioner denied their requested relief. Thereafter, the members appealed the Commissioner’s decision to the Hinds County Chancery Court, which granted the members relief on all but one issue. Aggrieved, MWUA has appealed the chancery court’s judgment, and the members have filed a cross-appeal.
¶ 3. MWUA presents eight issues for the Court’s review:
I. Whether the chancellor erred by reviewing the case de novo;
II. Whether the chancellor erred by finding that the Board did not have the authority to set and enforce the true-up deadline.
III. Whether the chancellor erred by finding that MWUA incorrectly applied its reinsurance.
IV. Whether the chancellor erred by finding that MWUA’s assessments are like privilege taxes.
V. Whether the Commissioner was arbitrary and capricious in ruling that (a) the mobile-home reporting issue was an issue for the Mississippi Department of Insurance, not MWUA; and (b) MWUA’s method of distributing recovered funds was acceptable.
VI. Did the chancellor err in overturning the Commissioner on each of the above issues?
VII. Did the chancellor err in ordering the MWUA to adopt new rules, regulations, and definitions concerning the assessment appeals when it had already adopted such rules consistent with its statutory mandate?
VIII. Alternatively, if the Court finds that the chancellor correctly ordered a resubmission of 2004 premium data, it should be clarified that all MWUA members may participate.
The members present one issue on cross-appeal:
I. Whether the chancellor erred by finding that grouping was permitted.
114. The Court affirms the chancellor’s judgment on two issues-grouping (cross-appeal) and reinsurance allocation (direct appeal). But the Court reverses and ren *220 ders the chancellor’s judgment on the remaining issues (direct appeal).

FACTS AND PROCEDURAL HISTORY

¶ 5. In 1987, the Legislature created MWUA to provide an adequate market for windstorm and hail insurance in Mississippi’s six coastal counties: George, Hancock, Harrison, Jackson, Pearl River, and Stone.[1] 1987 Miss. Laws ch. 459 § 1; Miss.Code Ann. § 83 — 34—1(f) (2005). Under the statute, every insurance company writing essential property insurance in Mississippi is required to become a member. Miss.Code Ann. § 83-34-3 (2005). Members are required to share in MWUA’s expenses, profits, and losses based on their participation percentage from the previous calendar year.[2] Miss. Code Ann. § 83-34-9 (2005). As an incentive, members that voluntarily offer wind and hail coverage receive credit for each voluntary premium written. Id.
¶ 6. As a result of Hurricane Katrina, the MWUA lost more than $700 million. MWUA had secured $175 million in reinsurance. Jim Redd, MWUA’s accountant, stated that he had applied the majority of the insurance to the 2004 policy year; thus, MWUA did not have to assess members for that policy year. The remainder of the reinsurance was applied to the 2005 policy year. After the reinsurance was applied, MWUA had a $545 million loss. MWUA assessed its members to cover the loss. On August 31, 2005, days after the hurricane, MWUA assessed its members $10 million. On December 2, 2005, MWUA assessed its members a second time for $285 million.
¶ 7. After the initial assessments, several members, including Audubon Insurance Company (MWUA’s servicing carrier), complained that they had incorrectly reported their 2004 premium figures. Audubon had incorrectly reported MWUA’s insurance policies as its own, increasing its participation percentage. MWUA gave Audubon a refund. The MWUA Board of Directors (Board) decided to give all members a “true-up,” an opportunity to submit corrected data.
¶ 8. On January 17, 2006, the Board mailed letters to the members explaining the true-up. The letter informed members that they had a one-time opportunity to submit corrected data, and that data had to be received by March 1, 2006, to be considered. The Board mailed a follow-up letter on February 1, 2006. The second letter reminded members of the March 1 deadline and assured members that assessments already paid would be reconciled against the new figures. MWUA also attached forms for members to use to report the corrected data.
¶ 9. On April 17, 2006, MWUA assessed its members a third time, using the new figures submitted during the true-up. The members appealed this third assessment to the Board. The Board considered these appeals at various times, considering written appeals and allowing some companies to make oral presentations. Ultimately, the Board denied each appeal, finding that it had the authority to allow the true-up, it had the authority to create and enforce the March 1, 2006, deadline, and the process was fair to all members.
¶ 10. The members then appealed the Board’s decision to the Insurance Commissioner (Commissioner). Giving deference to MWUA, the Commissioner agreed with *221 the Board and denied the members’ appeals. The members then appealed to the Hinds County Chancery Court. The actions were consolidated, and the chancellor entered an order allowing all MWUA members to join the appeal. The summonses indicated that, whether or not members responded to the notice, all members would be bound by the chancellor’s decision and any appellate court decisions rendered in this case, without any right to further recourse.
¶ 11. The chancellor determined that the Commissioner had erred by deferring to MWUA. Thus, the chancellor reviewed the appeal de novo, giving no deference to the Commissioner’s findings. The chancellor also ruled that: (1) credits for voluntary writings and exclusions for farm property are mandatory; (2) MWUA did not have the authority to set a deadline for members to receive those benefits; (3) assessments are a privilege tax; thus, overpaying members are entitled to a refund; (4) MWUA should have applied the reinsurance consistent with the liabilities; (5) grouping was not prohibited by statute; and (6) a mobile-home reporting issue required MWUA to recalculate all members’ participation percentages. Accordingly, the chancellor ordered MWUA to accept the members’ submissions, recalculate the assessments, and adopt new rules and regulations specifically dealing with the issues presented by the members.
¶ 12. On January 14, 2010, MWUA filed its notice of appeal. The members filed either a direct appeal or a cross-appeal from this action.

ANALYSIS

I. Standard of Review
¶ 13. The parties contest whether the Commissioner and the chancellor applied the appropriate standard of review on appeal. The members argue that the Commissioner should have reviewed the case de novo instead of giving deference to the Board, because the Board is not an administrative agency.[3] MWUA maintains that, regardless of whether the Commissioner employed the correct standard of review, the chancellor erred by reviewing the Commissioner’s decision de novo when it was entitled to deference.[4] In response, the members argue that, because the Commissioner failed to review the Board’s decision de novo, the chancellor employed the proper standard of review.[5]
¶ 14. When reviewing the Board’s decisions, the Commissioner noted that Mississippi Code Section 83-34-19 was silent as to what standard of review to apply. The statute states only that “[a]ny hearings held by the commissioner pursuant to such an appeal shall be in accordance with the procedure set forth in the insurance laws of Mississippi.” Miss.Code Ann. § 83-34-19 (2005). In Owens Corning v. Mississippi Insurance Guaranty Association, 947 So.2d 944 (Miss.2007), Mississippi Insurance Guaranty Association (MIGA) argued that it was a state agency and, thus, entitled to receive deference. Id. at 945-946 (¶ 5). The Supreme Court held that MIGA was not a state agency. Id. The Court reasoned that “MIGA is a nonprofit, unincorporated legal entity of which all insurers with the authority to transact in *222 surance in this State are made members.” Id. Accordingly, the Court found that MIGA was not entitled to deference. Id.
¶ 15. Like MIGA, MWUA is not an administrative agency and, thus, is not entitled to deference. But MWUA does not argue that it is an administrative agency. Instead, MWUA argues that the Commissioner’s decision, which is from an administrative agency, should have been given deference.
¶ 16. “[It] is the general rule in appeals from administrative agencies that this Court must uphold the decisions of the insurance commission absent a showing of capricious and arbitrary action.” Miss. Ins. Underwriting Ass’n v. Maenza, 413 So.2d 1384, 1389 (Miss.1982) (citing Miss. Ins. Comm’n v. Miss. State Rating Bureau, 220 So.2d 328, 333 (Miss.1969)). Uniform Circuit and County Court Rule 5.03 provides that:
On appeals from administrative agencies the court will only entertain an appeal to determine if the order or judgment of the lower authority:
1. Was supported by substantial evidence; or
2. Was arbitrary or capricious; or
3. Was beyond the power of the lower authority to make; or
4. Violated some statutory or constitutional right of the complaining party.
Because the Commissioner had deferred to the Board, the chancellor had determined that the Commissioner’s ruling was arbitrary and capricious. But the Commissioner’s failure to review the case de novo does not automatically render his judgment incorrect. Thus, this Court will give deference to the Commissioner’s decision as long as it is supported by substantial evidence and is not arbitrary and capricious.
II. True-up Deadline: Voluntary Credits and Farm-Property Exclusions
¶ 17. One party, Zurich American Insurance Company, argues that MWUA did not have authority to allow a true-up. Arguing that MWUA had authority to allow the true-up, other members state that MWUA did not have authority to set deadlines by which to submit the information.[6] The parties also contest whether credits for voluntary writings and farm-property exclusions are mandatory or if they are mandatory only if timely reported. MWUA argues that the members must timely report their voluntary writings and farm-property exclusions to receive the credit, and it has authority to set such deadlines.[7] Conversely, the members maintain that, under the statute, it is mandatory that members receive credit for their voluntary writings or farm-property exclusions.[8]
A. MWUA has authority to allow true-ups and set deadlines.
¶ 18. Zurich argues that MWUA did not have the authority to allow the true-up. *223 Other members argue that, while MWUA had authority to set the true-up, MWUA did not have authority to set a deadline.[9] MWUA argues that it had authority both to allow the true-up and to enforce the deadline.
¶ 19. After the August 2005 and December 2005 assessments, many members complained to MWUA, stating that then-data was incorrect. Hurricane Katrina was one of the deadliest and most costly natural disasters in the United States, specifically on the Gulf Coast. MWUA recognized the magnitude of Hurricane Katrina’s unprecedented effect on its members and, in an effort to administer the association in a fair and equitable manner, gave all members an opportunity to resubmit corrected data.
¶ 20. As the statute existed prior to Hurricane Katrina, Mississippi Code Section 83-34-13 provided that the plan of operation should “provide for the efficient, economical, fair and nondiscriminatory administration of the association.” It is true that no previously adopted rule gave the Board permission to allow a true-up. But because these were exigent circumstances that demanded unusual and immediate action, the Board was allowed to circumvent the process. The true-up was not an effort on behalf of MWUA to make a new rule; it was simply a remedy to the property-insurance chaos caused by Hurricane Katrina. The Board ordered the true-up in an effort to administer the association in a fair and equitable manner. Thus, MWUA did not act arbitrarily or capriciously in extending this offer. The true-up was a benefit to all members.
¶ 21. MWUA, and any entity for that matter, must have enforceable deadlines to operate properly. As the law existed prior to Hurricane Katrina, a member’s assessment was based on its net direct premiums written during the previous calendar year, and credit for voluntarily writings is given annually. Miss.Code Ann. § 83-34-9 (2005). Each member’s assessment is made in proportion to the total premiums written by all members during the previous calendar year. See id. Yes, members shall receive credit annually for their voluntary writings, and members are entitled to farm-property exclusions. But members can receive these benefits only if they timely report the information.
¶ 22. MWUA did not exceed its authority by giving members an opportunity to submit corrected data and by enforcing the true-up deadline. Thus, the chancellor erred by reversing the Commissioner’s decision on this point.
B. Voluntary Writings
¶ 23. The voluntary-writings provision provides, in part, that:
A member shall, in accordance with the plan of operation, annually receive credit for essential property insurance voluntarily written in a coast area, and its participation in the writings of the association shall be reduced in accordance with the provisions of the plan of operation.
Miss.Code Ann. § 83-34-9 (2005) (emphasis added). The Commissioner had determined that, although members shall receive credit for their voluntary writings, it is incumbent upon the members to submit their voluntary writings to MWUA. The chancellor had reversed the Commissioner’s findings, holding that: (1) the term “shall” evidenced the mandatory nature of the voluntary credits and farm-property exclusion, and (2) MWUA had no authority *224 to set a deadline for members to receive their credits or farm-property exclusion.
¶ 24. As noted by the Commissioner, MWUA’s Manual of Rules and Procedures Section VIII(2)(B) states, in part, that:
A participating company shall annually receive credit toward participation in the Association for Essential Property Insurance written in the “Pool.” Each participating company[,] in order to receive such credit, shall set up the necessary statistical procedures whereby they can accurately determine and furnish to the Association their voluntary writings.
In other words, members must submit proof of their voluntary writings to MWUA in order to receive credit. This is a reasonable and logical interpretation of the statutes and MWUA’s operating rules and procedures. MWUA required members to report their voluntary writings quarterly, within sixty days of the end of each quarter.[10] Thus, for the 2004 policy year, members’ voluntary writings were due by March 2005, at the latest.
¶ 25. Accordingly, we find that the Commissioner’s judgment was supported by substantial evidence and was not arbitrary and capricious. The chancellor erred by reversing the Commissioner on this point.
C. Farm-Property Exclusions
¶ 26. The farm-property exclusion provides that a member’s net-direct premiums do not include farm property. Miss.Code Ann. § 83 — 34—1(g) (2005). According to MWUA, it had provided a definition of “farm property” in its Welcome Packet, which all members received when they joined the association. On appeal, the Commissioner had determined that MWUA had provided the definition of farm property. Thus, it was the member’s fault if it did not understand the exclusion and failed to report it before the true-up deadline. The chancellor had reversed the Commissioner’s findings, holding that: (1) the term “shall” evidenced the mandatory nature of the voluntary credits and farm-property exclusion, and (2) MWUA had no authority to set a deadline for members to receive their credits or farm-property exclusions.
¶ 27. The Welcome Packet provided that:
“Farm Property” is defined as barns, granaries, outbuildings and other structures used in connection therewith, and their contents; also, livestock, poultry, hay and grain in stacks, farm implements and machinery; situated on land used for truck, fruit, livestock, dairy or other farm purposes.... This “Farm Property” definition does not include dwellings and auxiliary outbuildings in connection therewith.
The Welcome Packet also provided rules for submitting farm-property writings. In pertinent part, the Welcome Packet provided that “Copies of ‘Farm Property writings shall be submitted on a quarterly basis and such submissions are to be in the offices of the MWUA within 60 days of the end of each quarter.” Thus, like voluntary writings, members had to submit their 2004, farm-property writings by March 2005, at the latest.
*225 ¶ 28. One Beacon Insurance Group is the only member that argues it was not allowed to submit its farm-property writings for exclusion. One Beacon argues that it neither knew the definition of farm property nor knew how to submit the data, because the guidelines were not defined by MWUA’s governing statutes. One Beacon states that it contacted MWUA several times to obtain this information, but MWUA did not provide the information until after the true-up deadline. One Beacon also claims that Redd had assured its employee that it had correctly filed its “Insurer’s Report.”
¶ 29. Regardless, as noted by the Commissioner, members were allowed to exclude farm property well before Hurricane Katrina. Thus, the insurance companies have themselves to blame for not understanding the exclusion prior to Hurricane Katrina.
¶ 80. One Beacon also argues that it did not know that it could submit its farm-property exclusions during the true-up, because the true-up letters addressed only voluntary credits. But the true-up letters informed members that they could submit “corrected and/or supplemental information for their 2004 net direct premiums and 2004 voluntary windstorm and hail premiums.” Surely, farm-property exclusions were included in net direct premiums information.
¶ 31. In result, we find that the Commissioner’s judgment was supported by substantial evidence and was not arbitrary and capricious. The chancellor erred by reversing the Commissioner on this point.
III. Reinsurance Allocation
¶ 32. According to James Collins, president of Union National Fire Insurance Company, the 2004 insurance policies had incurred only 18% of Hurricane Katrina liabilities. However, MWUA had applied $116 million (66%) of the reinsurance to the 2004 policy year. According to Redd, MWUA chose to apply reinsurance this way to avoid a “double assessment,” and he had consulted an outside accounting agency, Property Insurance Plans Service Office (PIPSO), before doing so.
¶ 33. The parties disagree as to how MWUA should have allocated the reinsurance proceeds between the 2004 and 2005 policy years. MWUA argues that no authority requires it to follow a certain method of allocation. MWUA maintains that it followed its own historical accounting method, about which no member previously has complained. The members argue that MWUA should have followed the National Association of Insurance Commissioners’ (“NAIC”) guideline that reinsurance should be applied consistent with the losses.[11]
¶ 34. The Commissioner had determined that MWUA’s method of reinsurance allocation was appropriate, finding that: (1) companies’ participation percentages changed little from year to year; (2) the difference in funds would not have been significant; (3) the reinsurance proceeds were applied based on precedent followed by MWUA for years; (4) no member had complained about the process in the past; and (5) no authority mandated MWUA to follow a specific accounting practice. The chancellor had found that the Commissioner’s decision was arbitrary and capricious. The chancellor had reasoned that members had to report to MWUA using statutory accounting principles, MWUA should be held to the same standard, and the authorities that MWUA relied upon did not support its position.
*226 ¶ 35. In its manual, PIPSO states, in part, that “[sjtatutory requirements are those established by the National Association of Insurance Commissioners (NAIC) and are conservative.... ” The NAIC accounting manual provides, in pertinent part, that:
Reinsurance recoverables shall be recognized in a manner consistent with the liabilities (including estimated amounts for claims incurred but not reported) relating to the underlying reinsured contracts. Assumptions used in estimating reinsurance recoverables shall be consistent with those used in estimating the related liabilities.
¶ 36. The Commissioner’s finding was arbitrary and capricious. Whether the difference in the assessment is one or one-million dollars, the money belongs to the company, and MWUA cannot arbitrarily decide how to apply the reinsurance. Any slight change in a member’s participation percentage from one year to the next can equate to large savings. MWUA’s accounting method flies in the face of equity and fairness, the very principles it is statutorily mandated to uphold.
¶ 37. The reinsurance should be applied consistent with the liabilities for any given policy year. Thus, we affirm the chancellor on this point. For an accurate assessment, the figures should be recalculated using the method mandated by Section 83-34-9.
IV. Privilege Taxes
¶ 38. The parties disagree as to whether MWUA’s assessments are akin to privilege taxes, which are refunded if overpaid. The distinction also will help determine whether members can take advantage of the three-year statute of limitations provided by the privilege-tax statute. See Miss.Code Ann. § 27-73-5 (Rev.2010). MWUA argues that its assessments do not fit within the statute.[12] Conversely, the members contend that the assessment is like a privilege tax, because all insurers engaged in writing property insurance in the state are required to participate in the windpool.[13]
¶ 39. A privilege tax is assessed against a specified group of persons for the privilege of doing business in the State.[14] Miss.Code Ann. § 27-15-11 (Rev.2010). Those taxpayers who have overpaid their privilege taxes to the Auditor of Public Accounts or the Commissioner of Insurance are entitled to a refund. Miss.Code Ann. § 27-73-1 (Rev.2010). That refund is subject to a three-year statute of limitations. Miss.Code. Ann. § 27-73-5 (Rev. 2010).
¶ 40. MWUA assessments are not a privilege tax. First, the assessments are paid to MWUA, not the Auditor or Commissioner. Second, the assessments are not taxes levied against all insurance com *227 panies. MWUA assesses only insurance companies that choose to write essential property insurance in the state. Miss. Code Ann. § 83-34-3 (2005). MWUA was created to provide an adequate market for wind and hail insurance on the Coast and to implicitly encourage insurance companies to voluntarily write wind and hail policies on the Coast. 1987 Miss. Laws ch. 459 § 1. That is why members may receive credit for their voluntary writings, thereby reducing their assessment. See Miss.Code Ann. § 83-34-9 (2005).
¶ 41. Also, as MWUA argues, the privilege-tax scenario would affect only the individual taxpayer. In the windpool, a change to one member’s assessment would affect all other members. See Miss.Code Ann. § 83-34-9 (2005). Under the MWUA statutes, the Legislature clearly stated that “[a] member shall, in accordance with the plan of operation, annually receive credit for essential property insurance voluntarily written in a coast area.” Miss.Code Ann. § 83-34-9 (2005) (emphasis added). The process would be harmed if it were to remain open for years.
¶ 42. Furthermore, the Legislature cleared up any confusion with its 2007 amendment of Section 83-34-3, which provides, in pertinent part, that:
The premiums, assessments, fees, investment income and other revenue of the association are funds received for the sole purpose of providing insurance coverage, paying claims for Mississippi citizens insured by the association, securing and repaying debt obligations issued by the association, and conducting all other activities of the association, all as required or permitted by this chapter. Such revenue shall not be considered taxes, fees, licenses or charges for services imposed by the State of Mississippi on individuals, businesses, or agencies, and shall not be used for other purposes.
Miss.Code Ann. § 83-34-3(4) (Rev.2011) (emphasis added). The Legislature’s amendment further supports a finding that assessments never were considered to be a privilege tax.
¶ 43. The rules and statute of limitations governing privilege taxes do not apply in this case. The Commissioner’s decision was supported by substantial evidence and was not arbitrary and capricious. Thus, the chancellor erred by reversing the Commissioner on this point.
V. Mobile-Home Premium Reporting
¶ 44. According to the parties, the Mississippi Department of Insurance had discovered that some members had incorrectly classified mobile-home premiums as auto insurance. The Department of Insurance had issued a bulletin that required misreporting members to file an amended statement with the department and MWUA. MWUA has assured that the funds collected will be used to pay Hurricane Katrina losses in excess of the $700 million, and the remaining funds will be distributed to other members on a pro rata basis.
¶ 45. At the time of the Commissioner’s ruling, the department was still reviewing the issue, and only one company had been identified that may have misreported its premiums. Thus, the Commissioner found that the issue was not ripe for review. On appeal, the chancellor differed and determined that it would have been arbitrary and capricious for MWUA to collect these funds without recalculating each member’s percentage of participation.
¶ 46. The members argue that, because MWUA has to recalculate participation percentages for the offending members, MWUA should accept their corrected data *228 and recalculate participation percentages for all members.[15] MWUA argues that its true-up process was fair, and that the mobile-home reporting issue is a separate problem that does not concern this case.
¶ 47. The Department of Insurance had determined that some members incorrectly had classified mobile-home insurance as automobile insurance. Because MWUA does not receive information regarding automobile-insurance premiums, MWUA had no way to know that these members had misreported their mobile-home writings. The Department of Insurance is pursuing those members.[16] This appeal concerns whether members who submitted their voluntary writings or farm-property exclusions after the March 1, 2006, deadline should receive credit for those filings. One has nothing to do with the other.
¶ 48. The members attempt to use this mobile-home reporting issue as a way to submit their voluntary credits. But the mobile-home reporting issue has nothing to do with the tardy submission of voluntary credits or farm-property exclusions, and it does not excuse the tardiness of such submissions. MWUA should not be required to let members who missed the true-up deadline submit corrected information based on the mobile-home reporting issue.
¶ 49. The Commissioner was in the.best position to determine this issue. The Commissioner’s ruling was supported by substantial evidence and not arbitrary and capricious. Thus, the chancellor erred by reversing the Commissioner on this point.
VI. Did the chancellor err by reversing the Commissioner’s decision?
¶ 50. MWUA has listed this as a distinct issue, but the Court chooses to address this assignment of error during the course of its analysis.
VII. Adopting New Rules
¶ 51. In reversing the Commissioner, the chancellor also ordered MWUA to adopt rules and regulations concerning the following: the time for appeals, how and when to amend assessments, how to seek a refund for overpayment, any applicable statute of limitations, a definition of farm property, and rules for denying voluntary credits. MWUA argues that it already had rules in place for these matters; thus, the chancellor erred by ordering it to adopt new rules.
¶ 52. Members have the right to be fully informed of the rules by which they are governed. To that extent, it would behoove MWUA to ensure that all of these issues have been addressed specifically by statute or by their own plan of operation. But while we agree with the chancellor, the chancellor did not have the authority to require MWUA to adopt new rules and regulations.
¶ 53. Fortunately, the Legislature already has addressed many of these concerns. MWUA already had appellate procedures in place. The Court notes that the original statute provided instructions *229 for appeals. See Miss.Code Ann. § 83-34-19 (2005). But in 2007, the Legislature substantially revised the MWUA statutes. See Miss.Code Ann. §§ 83-34-1 to 83-34-37 (Rev.2011). For instance, Section 83-34-19 also was amended by the Legislature. See Miss.Code Ann. § 83-34-19 (Rev.2011). A codified definition of “farm property” has been added to the statute. See Miss.Code Ann. § 83-34-l(h) (Rev. 2011). Grouping is specifically allowed by statute. See Miss.Code Ann. § 83-34-9(1) (Rev.2011). Section 83-34-11 addresses refunds. See Miss.Code Ann. § 83-34-11 (Rev.2011). The Legislature also has provided instructions for MWUA, members, and the Commission to follow in years in which hurricane losses exceed reinsurance. Miss.Code Ann. § 83-34-33 (Rev.2011).
¶ 54. The record does not contain information regarding whether MWUA has adopted rules for amending assessments and denying voluntary credits. Such rules probably would be included in MWUA’s most current plan of operation, which is not before us today. Nevertheless, the chancellor lacked authority to require MWUA to adopt new rules and regulations.
VIII. This ruling affects every member of MWUA.
¶55. MWUA argues that the chancellor erred by finding that the appealing members were entitled to relief. Alternatively, MWUA argues that, if the Court finds that the chancellor’s judgment is correct, the chancellor’s judgment should be clarified so that all MWUA members may participate in the resubmission.
¶ 56. In his order allowing joinder, the chancellor specifically instructed the members that:
Whether or not you respond, you will be bound by the results of any orders of the trial and/or appellate courts concerning the MWUA assessments for Hurricane Katrina. You will be required to pay or receive any reassessment or refund ordered by the Court without any right of further recourse.
Thus, the chancellor clearly stated that the results of this case would apply equally to all MWUA members, not just the appealing members.

CROSS-APPEAL

I. Grouping
¶ 57. The parties disagree as to whether group reporting is appropriate. Some members argue that group reporting was not permitted under the statute as it existed in 2004 and 2005.[17] One member, Farmers Insurance Group of Companies, supports the decision to allow grouping. MWUA argues that nothing in the statute specifically prohibited grouping. Also, MWUA maintains that it previously had allowed grouping for thirty-five years, and no member had complained about the practice before Hurricane Katrina. Thus, according to MWUA, the practice should stand.[18]
¶ 58. Members that oppose grouping argue that small companies are adversely *230 affected by grouping because those companies have to carry the burden of financing benefits enjoyed by large conglomerates. The members maintain that Section 83-84-9 and Section IX of MWUA’s Plan of Operation specifically prohibited grouping.[19] Both provided, in pertinent part, that:
All members of the association shall participate in its writings, expenses profits and losses in the proportion that the net direct premiums of each such member written in this state during the preceding calendar year bears to the aggregate net direct premiums written in this state by all members of the association....
Miss.Code Ann. § 83-34-9 (2005). As support for its position, the members note that, after members’ complaints and upon advice from counsel, MWUA had suspended group reporting. MWUA acknowledges that this is true. The Board published a notice to members stating, in pertinent part that:
It has come to our attention that the statutes that create and govern MWUA do not allow for the use of group numbers in the determination of percentages or participation. Like Statutory Annual Statements, the data for MWUA must be by Member company and not by groups of member companies. Each insurance company writing property insurance in Mississippi is a separate member of MWUA and must submit its own separate data.
In light of this acknowledgment, MWUA maintains that grouping was not “illegal,” but the practice was not specifically allowed by statute.
¶ 59. The Commissioner rejected the argument that group reporting was illegal. The Commissioner had determined that, even if a member had grouped its voluntary credits with affiliated companies, each member had received an individual assessment. Accordingly, the Commissioner held that MWUA’s interpretation of the governing statutes allowed the Board, in its discretion, to permit grouping, and it was a reasonable interpretation. On appeal, the chancellor agreed with the Commissioner’s ruling, stating that:
At the hearing of this matter, Aegis presented information regarding the large number of companies that took advantage of group reporting. As the Commissioner found, “from 1971 until the end of 2006, MWUA (and its predecessor) had allowed companies to ‘group’ ... their reported numbers.” Commissioner’s February 11, 2009 Order at 19. The information presented by Aegis, including the history of grouping, the open and obvious nature of group reporting (every annual report has an entire section dedicated to the question of group reporting), and the varied opinion presented by the appealing companies themselves is sufficient for this Court to find that the Commissioner’s decision was neither arbitrary nor capricious.
¶ 60. After reviewing the applicable law, the Court finds that the statutes— as they existed in 2004 and 2005 — did not specifically prohibit grouping. MWUA and its predecessor had allowed the practice for thirty-five years, during which no member had complained about the practice. In fact, MWUA’s reporting forms specifically provided a place for members to report in groups. Thus, all members were aware of or had notice of the practice.
¶ 61. In 2007, the Legislature amended Section 83-34-9 specifically to allow grouping. The statute now provides, in pertinent part, that:
*231 The association may allow affiliated insurers to combine their annual net direct premiums and other data, including data that supports any incentives that may be allowed by the association, to the extent that such grouping promotes the voluntary writing of essential property insurance in the coast area.
Miss.Code Ann. § 83-34-9(1) (Rev.2011).
¶ 62. The Commissioner’s and chancellor’s findings that grouping is a permissible practice are supported by substantial evidence and are not arbitrary and capricious. As a result, the ruling on this issue is affirmed.
CONCLUSION
¶ 63. Because the Commissioner’s decision was supported by substantial evidence and was not arbitrary and capricious, the Court reverses and renders the chancellor’s judgment regarding the following issues: whether MWUA had authority to set and enforce a true-up deadline, the mandatory nature of voluntary credits and farm-property exclusions, whether assessments are akin to privilege taxes, and the mobile-home reporting issue. Because the chancellor lacked authority to order MWUA to adopt new rules, the Court reverses and renders this part of the chancellor’s judgment. The Court affirms the chancellor’s judgment regarding two issues — grouping and reinsurance.
¶ 64. ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED IN PART AND RENDERED. ON CROSS-APPEAL: AFFIRMED.
WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.

. The controlling statutes were substantially amended in 2007. Thus, the previous version of the statutes will be applied.

. Insurance companies are no longer called members, and the companies no longer share in MWUA’s profits. See Miss.Code Ann. § 83-34-3(2) (Rev.2011).

. The members include the following: Union National Fire Insurance Company, United States Fire Insurance Company, RLI Insurance Company, One Beacon Insurance Group, Zurich, Homesite Insurance Company, and Farmer Insurance Group of Companies.

. St. Paul Companies and Travelers Property Casualty Corporation filed a joint amici brief and support MWUA on this point.

. See supra note 3.

.The following members support this argument: Union National Fire Insurance Company, United States Fire Insurance Company, RLI Insurance Company, One Beacon Insurance Group (raising farm-property exclusion argument), and Homesite Insurance Company. American Bankers Insurance Company of Florida, American Reliable Insurance Company, and American Security Insurance Company filed a joint amici brief, supporting the parties’ argument.

. Liberty Mutual Insurance Group, Safeco Insurance Company, Wausau Insurance Group, Prudential Insurance Company, and Ohio Casualty Group filed a joint amici brief and support MWUA on this issue.

. See supra note 6.

. See supra note 6. In addition, Union National Fire, United States Fire, Homesite, and One Beacon filed a joint reply brief opposing Zurich's position.

. The MWUA Welcome Packet states that:
In order to properly give credit for voluntary writings in the MWUA, a bordereau or document copies are required to be submitted on a quarterly basis following the same informational requirements as outlines in the paragraphs above, but such voluntary writings are to be for the six counties in the MWUA ..., with submissions to be quarterly and such submissions are to be in the offices of the MWUA within 60 days of the end of each quarter.

. Three companies raised this argument: Union National Fire, Homesite, and Farmers.

. Liberty Mutual Insurance Group, Safeco Insurance Company, Wausau Insurance Group, Prudential Insurance Company, and Ohio Casualty Group filed a joint amici brief in support of MWUA’s position.

. Members who make this argument include the following: Union National Fire, United States Fire, One Beacon, Homesite, and Farmers.

. Mississippi Code Section 27-15-11 provides that:
Every person desiring to engage in any business, or exercise any privilege hereafter specified shall first, before commencing same, apply for, pay for, and procure from the state tax commissioner or commissioner of insurance, a privilege license authorizing him to engage in the business or exercise the privilege specified therein, and the amount of tax shown in the following sections is hereby imposed for the privilege of engaging or continuing in the business set out therein.

. The mobile-home reporting issue is raised by Union National Fire, Aegis, Homesite, and Farmers.

. In its bulletin entitled "Proper Accounting Treatment for Premiums Written for Coverage on Mobile Homes," the Department of Insurance stated, in pertinent part, that:
The failure of an insurance company to comply with the directives of this Bulletin shall result in further administrative action, which may include the imposition of fines and the commencement of license suspension and/or revocation proceedings.

. The members who oppose grouping include Union National Fire, Aegis, and Home-site. Other members are silent on this issue. Those members took advantage of grouping and filed their premium data along with affiliated companies.

. Allstate Property and Casualty Insurance Company filed a brief supporting grouping. Also, supporting amici briefs were filed by St. Paul Companies and Travelers Property Casualty Corporation and American Bankers Insurance Company of Florida, American Reliable Insurance Company, and American Security Insurance Company.

. See supra note 17.