# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-01638-SCT

*ARROWOOD INDEMNITY COMPANY*

*v.*

*MISSISSIPPI WINDSTORM UNDERWRITING ASSOCIATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/16/2014 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| TRIAL COURT ATTORNEYS: | CHRISTOPHER ROYCE SHAW |
| | ROBERT B. HOUSE |
| | REBECCA SUZANNE BLUNDEN |
| | ELLEN PATTON ROBB |
| | TAMMRA CASCIO |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ANDREW S. HARRIS |
| | H. MITCHELL COWAN |
| | KAYTIE M. PICKETT |
| ATTORNEYS FOR APPELLEE: | REBECCA BLUNDEN |
| | CHARLES G. COPELAND |
| | ELLEN ROBB |
| | JAMES H. HEIDELBERG |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND REMANDED - 06/16/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

LAMAR, JUSTICE, FOR THE COURT:

¶1.     Arrowood Indemnity Company,[1] a member of the Mississippi Windstorm Underwriting Association ("the Windpool"), submitted its premium data as required for a post-Katrina data-correction process.  Arrowood failed to claim the appropriate credits available to it by statute which, it alleges, resulted in a nearly five-million-dollar overpayment.  But Arrowood had based its data submission on information provided by the Windpool, which was incorrect.  So Arrowood requested an opportunity to submit the correct information, but the Windpool denied its request because the deadline for corrections had passed.  The Mississippi Insurance Commissioner and the Hinds County Chancery Court affirmed the Windpool's decision.  We find that the Windpool's deadline is tolled under the facts of this case as it pertains to Arrowood, because *its* incorrect representation precipitated Arrowood's incorrect data submission.  We therefore reverse the decisions of the Insurance Commissioner and the Hinds County Chancery Court and remand this case for proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶2.     The parties stipulated to virtually every fact in this case. The Windpool is a statutorily created entity that provides wind and hail insurance to citizens on Mississippi's Gulf Coast—it is an "insurer of last resort."  Every insurance company that wrote property

---

[1]We use the name "Arrowood," though its name and ownership have changed since 2004.  Arrowood is the current trade name for Royal Indemnity Company, which was an affiliate of Royal & Sun Alliance Group, PLC, or simply "Royal," which was the original reporting company.

insurance in Mississippi at the time relevant to this appeal was a member of the Windpool.[2]

As members, the insurance companies were required to participate in the Windpool's expenses, losses, and profits. Each company's share of the expenses, losses, and profits was based on "their percentages of wind and hail insurance premium writings in Mississippi during the preceding calendar year." The member companies reported their premium data to the Windpool every year, so that it could calculate each company's participation percentage. *See* Miss. Code Ann. § 83-34-9 (2006).

¶3. If the Windpool suffered losses that exceeded its available assets during a policy year,[3] it would assess member companies a dollar amount based on each company's participation percentage to cover those losses. The applicable statutes offered an incentive to members voluntarily to write wind and hail coverage on the Gulf Coast: "A member shall, in accordance with the [Windpool's] plan of operation, annually receive credit for essential property insurance voluntarily written in a coast area, and its participation in the writings of the association shall be reduced in accordance with the provisions of the plan of operation." Miss. Code Ann. § 83-34-9 (2006). So by voluntarily writing wind and hail policies on the

---

[2]The applicable statutes were amended significantly in 2007, but those amendments provided that the pre-2007 versions would apply to events that took place before March 22, 2007. Miss. Code Ann. 83-34-3(2) (Supp. 2015). The parties agree that the pre-2007 version of the statutes governs this appeal.

[3]A policy year is the twelve-month period after a policy is issued. So when Hurricane Katrina made landfall on August 29, 2005, it damaged properties that had policies in effect from both the 2004 and 2005 policy years. Policies from policy year 2004 would have been those that were issued between August 30 and December 31, 2004. And policies from policy year 2005 would have been those issued between January 1 and August 29, 2005.

Coast, companies received credits that would reduce—or even eliminate—their portion of an assessment.

¶4. On March 2, 2004, Arrowood reported to the Windpool that its wind and hail premiums from 2003 totaled $3,328,914. This amount included premiums for excess policies—even those that were voluntarily written—and was consistent with the position the Windpool took the following year: that excess policies did not count as "essential property insurance" and therefore were not eligible for voluntary-writings credit. On September 29, 2005, Arrowood employee David Thomas sent the Windpool an email stating: "We had spoken with you late in 2004 to ask if excess policies were eligible for windstorm pool credits. You[r] response was that they were not . . . .Would you please clarify how Excess property coverage is not eligible for pool credits[?]"

¶5. Windpool accountant Jim Redd responded with a faxed attorney's opinion which explained that:

> "Essential property insurance" is defined by the Act as insurance against direct loss to property as defined and limited in the standard fire policy and extended coverage endorsement thereon, as approved by the Mississippi Insurance Commission. Essential property insurance is that insurance required by the Act to be written by the Association. *Excess insurance even though on the same properties does not constitute essential property insurance within the meaning of the Act . . . .*

(Emphasis added.) Stated differently, the Windpool responded that, because excess insurance did not qualify as "essential property insurance" under the Act, Arrowood was not entitled to any voluntary-writings credit for those premiums. *See* Miss. Code Ann. § 83-34-9 (2006).

4

### *Hurricane Katrina and the "true-ups"*

¶6.    When Hurricane Katrina struck in 2005, the Windpool suffered its largest loss ever—far above what its $175 million reinsurance would cover.[4] The reinsurance proceeds covered the losses from the 2004 policy year, but the Windpool was forced to assess its members $545 million to cover the losses from the 2005 policy year. The Windpool based that entire assessment on each company's participation percentage from the 2005 policy year, which, in turn, was based on premium data from 2004. Before the Windpool issued the final installment of the assessment, it offered affected members an opportunity to examine their 2004 premium data to ensure that it had been properly reported. But the assessment did not affect Arrowood because it did not write any relevant policies in 2004.

¶7.    Dubbed a "true-up," the corrections period had a deadline of March 1, 2006. Several member companies attempted to submit new data after the deadline, but the Windpool refused to accept the late data. Those members appealed that decision—along with several other true-up-related issues—to the Commissioner of Insurance, who affirmed the actions of the Windpool. The Hinds County Chancery Court reversed the Commissioner, ruling in favor of the members, and the Windpool appealed to this Court.

¶8.    On appeal, this Court held that the Windpool had the authority to conduct the true-up and to set a deadline and enforce it:

---

[4]"Reinsurance is a process by which an insurance company reduces the extent of its possible loss under any issued policies by distributing all or part of its potential loss to another insurance company." *Estate of Osborn v. Gerling Global Life Ins. Co.*, 529 So. 2d 169 (Miss. 1988) (citing *Fontenot v. Marquette Cas. Co.*, 247 So. 2d 572, 575 (La. 1971)). In other words, the Windpool had purchased $175 million worth of insurance for its insurance policies.

Hurricane Katrina was one of the deadliest and most costly natural disasters in the United States, specifically on the Gulf Coast. [The Windpool] recognized the magnitude of Hurricane Katrina's unprecedented effect on its members and, in an effort to administer the association in a fair and equitable manner, gave all members an opportunity to resubmit corrected data.

. . . .

It is true that no previously adopted rule gave the [Windpool] permission to allow a true-up. But because these were exigent circumstances that demanded unusual and immediate action, [it] was allowed to circumvent the process. The true-up was not an effort on behalf of [the Windpool] to make a new rule; it was simply a remedy to the property-insurance chaos caused by Hurricane Katrina.

. . . .

[The Windpool], and any entity for that matter, must have enforceable deadlines to operate properly. As the law existed prior to Hurricane Katrina, a member's assessment was based on its net direct premiums written during the previous calendar year, and credit for voluntar[y] writings is given annually. Miss. Code Ann. § 83-34-9 (2005). Each member's assessment is made in proportion to the total premiums written by all members during the previous calendar year. *See id.* Yes, members shall receive credit annually for their voluntary writings . . . . But members can receive these benefits only if they timely report the information.

***Mississippi Windstorm Underwriting Ass'n v. Union Nat'l Fire Ins. Co.***, 86 So. 3d 216, 223

(Miss. 2012).

¶9.     But this Court also found that the Windpool's decision to apply a majority of the reinsurance to cover the 2004 policy-year losses was erroneous. ***Id.*** at 225-26. Rather, this Court said, "[t]he reinsurance should be applied consistent with the liabilities for any given policy year . . . . For an accurate assessment, the figures should be recalculated using the method mandated by Section 83–34–9." ***Id.*** at 226.

¶10.    Following ***Union National***, the Windpool reallocated the $175 million reinsurance between the policy years based on participation percentage, rather than using most of it to cover completely the 2004 policy-year losses. As a result, "the 2004 policy year did not have

6

sufficient funds to cover the losses without an assessment." And because some of that resulting assessment would be based on 2003 premium data, the Windpool decided to offer companies another true-up for that year's information.

¶11. On August 16, 2012, the Windpool sent members a letter informing them of the upcoming true-up and telling them that details and deadline information would be released over the next few months. On October 25, 2012, the Windpool sent a more detailed letter to members, setting out the forms needed, the procedure for submission, and a final submission deadline of January 1, 2013. The Windpool sent a third letter to members on December 10, 2012, which reminded them of the January 1, 2013, deadline and stated that "submissions received by the [Windpool] after January 1, 2013 will not be accepted."

¶12. Arrowood sent the Windpool a letter of intent on December 13, 2012, and said that it would not be resubmitting any data for the second true-up. As such, the Windpool would use Arrowood's original 2003 data that it had submitted in early 2004 to calculate its participation percentage for the reassessment made necessary by *Union National*. On February 15, 2013, the Windpool informed each member of its estimated participation percentage.

¶13. Arrowood then emailed the Windpool on March 27, 2013, expressing concerns about "[a] significant issue with [its] 2003 reportable data," and asking to schedule a conference call with Windpool representatives. During a subsequent email exchange, Arrowood attached the attorney's opinion that the Windpool had sent it in 2005 to explain why it had reported its premiums the way it did.

¶14.   Brad Little, an assistant manager for the Windpool, responded and stated that the attorney's opinion contained incorrect information, and that Arrowood *should have* received voluntary-writings credit for much of its 2003 premiums:

> [P]roperty extended coverage premium[s] written on a direct basis by a MS Dept. of Ins. admitted member carrier was assessable by the [Windpool] in the pre-[2007] structure.
>
> It [does] not matter whether the extended coverage premium was written for the entire limits for a given risk, or some layer of limits for the risk. If the coverage was direct premium reportable to the MS DOI, it was subject to wind pool insurer reporting requirements. *It was also eligible for voluntary wind/hail write out credits if related to a risk located in the lower 6 coastal counties (when wind/hail was included for coverage).*
>
> Non admitted, excess and surplus carrier premium was not assessable. *However, a layered property extended coverage premium written on a direct basis through any admitted carrier as reported to the MS DOI was (and is) assessable.*
>
> Joel [Ferriss, another Windpool official] and I did see where some form of attorney opinion was included with [Arrowood's] 3-27-13 email. *However, the author was not noted and it frankly appears incorrect.* We can discuss issues for clarification if you continue to feel an appeal to the [Windpool] Board is desired.

(Emphasis added.)

¶15.   On April 5, 2013, Arrowood responded to Little via letter and stated

> Given that Essential Property Insurance does not include excess coverage; such coverage should not be reportable for purposes of participation calculations.  To assess companies using [a] participation calculation that include[s] other than essential property insurance when they are not allowed to report voluntary writings is inequitable.  Alternatively, should Arrowood be required to report the excess premiums, we believe that it is appropriate to allow those same excess premiums written in the wind zone counties to be eligible for wind pool credits.

> We request that you accept this re-filed 2003 end of year premium data to be used for 2004 participation calculation. We only became aware of the reporting error upon our review of the Preliminary Calculation of Participation Percentages After Allowing for Re-filing which was received with your letter dated February 15, 2013.

But the Windpool denied Arrowood's request via letter, because Arrowood made the request after the January 1, 2013 deadline. The Windpool noted that it had apprised Arrowood of the deadline in its various letters sent in late 2012, and that this Court had upheld its authority to conduct a true-up and to set and enforce a deadline. The Windpool also informed Arrowood that it could appeal its decision to the Insurance Commissioner within thirty days.

### *Arrowood's Appeals to the Commissioner and Chancery Court*

¶16. Arrowood appealed to the Commissioner, who affirmed the Windpool's decision. Although the Commissioner's findings of fact included the email-and-fax exchange wherein the Windpool told Arrowood that its excess policies were ineligible for voluntary-writings credit, he did not analyze that information in his conclusions of law. Rather, the entirety of the Commissioner's substantive analysis consisted of three sentences explaining that ***Union National*** controlled:

> [T]he [Windpool] has not denied Arrowood any constitutional or statutory right; the Mississippi Supreme Court has already determined that the [Windpool] has the power to set a deadline, require adherence to the deadline, and deny its former member an unlimited right to correct their own reporting errors.

> [T]he [***Union National***] case addressed the exact same issue on essentially identical facts. The only material difference between the previous Hurricane Katrina assessment appeals and this one is that the true-up is for 2004 rather than 2005.

9

Arrowood failed to submit the now-requested changes prior to the January 1, 2013 deadline.

So the Commissioner held that the Windpool could enforce the deadline and prevent Arrowood from resubmitting its data.

¶17. Arrowood then appealed to the Hinds County Chancery Court, which affirmed the Commissioner's decision. The chancellor, like the Commissioner, found that **Union National** allowed the Windpool to set and enforce deadlines. As for the Windpool's misrepresentation to Arrowood, the chancellor found that Arrowood was simply "confused" about excess policies, and that "if Arrowood wanted the credit Arrowood should have timely provided all the information [the Windpool] requested." The chancellor made no mention of the fax that the Windpool sent to Arrowood with admittedly false information about credits, but found instead that "the fact that Arrowood had several chances to adhere to th[e] deadline and failed to do so is not [the Windpool]'s fault or concern." The chancellor also said that "[f]or Arrowood to delay [the true-up] process due to being 'confused' about the information it was supposed to submit, goes to the very nature of why deadlines are important to the Supreme Court."

¶18. The chancellor denied Arrowood's motion for rehearing, and Arrowood now appeals to this Court and raises several issues. But we address Arrowood's second issue only, which we find dispositive, and restate as: Is the Windpool's deadline tolled as to Arrowood because the Windpool's own incorrect representations led to Arrowood's inaccurate submission?[5]

_____

[5]Arrowood raises three other issues, which we do not address: (1) the Windpool arbitrarily and capriciously allowed one insurer and not another to circumvent its deadlines; (3) the Commissioner's decision to enforce the Windpool's deadlines was not within his

10

## ANALYSIS

¶19.    Arrowood argues that the Commissioner erred when he "[allowed] the Windpool to ignore the effect of its prior misrepresentation." Arrowood points out that, while the Commissioner was aware of the Windpool's 2005 misrepresentation, he still found that it had the authority to enforce its deadlines; a finding which was an "erroneous" interpretation of this Court's precedent. Arrowood argues further that the Windpool "misrepresented its interpretation of key statutory terminology to Arrowood," and that the misrepresentation was material.

¶20.    Negligent misrepresentation is applicable when a party proves:

> (1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; 3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.

*Horace Mann Life Ins. Co. v. Nunaley*, 960 So. 2d 455, 461 (Miss. 2007). And this Court has acknowledged that misrepresentation by a party may toll the applicable statute of limitations when another party relies on that misrepresentation. *Holbrook v. Albright Mobile Homes, Inc.*, 703 So. 2d 842, 845 (Miss. 1997) ("It is clear that genuine issues of material fact exist in this case such that summary judgment should not have been granted . . . , whether Albright misled the Holbrooks into believing no coverage existed is disputed,

---

scope or power because the Windpool lacks authority to set and enforce the true-up deadline without promulgation and approval of formal rules; and (4) the Commissioner erred as a matter of law in granting the Windpool deference in his review.

whether the Holbrooks relied on any such misleading statements such that the statute of limitations should be tolled must be resolved.").

¶21. Here, the parties have stipulated, and the Commissioner found, that Arrowood asked the Windpool if it could receive voluntary-writings credit for its excess policies. Arrowood explained in that email that it had "locate[d] a definition of Essential Property in the Plan, but [was] unable to clearly find a specific exclusion of Excess coverage." And as explained above, the significance of this inquiry is that only "essential property insurance" is eligible for voluntary-writings credit. *See* Miss. Code Ann. § 83-34-9.

¶22. The Windpool answered Arrowood's question by stating expressly that "[e]xcess insurance even though on the same properties does not constitute essential property insurance within the meaning of the Act. . . ." Based on that answer, Arrowood did not seek to correct the reporting of its net direct premiums during the true-up, nor did it seek to get voluntary-writings credit for the portion of those premiums that were for excess policies. Only after the deadline did the Windpool disavow the information in the attorney's opinion it had faxed to Arrowood.

¶23. The Windpool ostensibly concedes that its representation to Arrowood was "confusing." But Arrowood has not argued that it ever was confused about the Windpool's answer, and we fail to see how that answer *could be* confusing to someone who had asked that specific question. Indeed, we find only one time in the record where counsel for Arrowood used the term "confusion" regarding the excess-policy question, and he did so when referring to Arrowood's state of mind *that led to* it asking the Windpool for

12

clarification, not when referring to the Windpool's answer.  So we disagree with the chancellor's finding[6] and the Windpool's implication that Arrowood was "confused" by the Windpool's answer.  Rather, any confusion Arrowood had is what *prompted* it to ask the Windpool why excess coverage was not eligible for voluntary-writings credit.  And it was the incorrect information provided by the Windpool upon which Arrowood relied when it failed to claim that credit.

¶24.    The Windpool also argues that Arrowood's reliance was unreasonable because the pre-true-up letters it sent contained "accurate and complete information . . . including what a voluntary writing was and how to get credit for it."  Specifically, the Windpool highlights several statements in those letters that purportedly "contradicted [its] previous misstatement," such that Arrowood could not reasonably rely on it:

- The 2004 policy year percentages of participation are based upon 2003 end of year reported data (statewide writings and wind zone voluntary writings credit).

- [M]any member companies advised the [Windpool] that they had not properly reported their 2004 voluntary property writings on the Mississippi coast. Failing to properly report these writings increased their percentage of assessment for policy year 2005.

- Each member company participated in the profits or losses of each policy year based on its percentage of the property insurance in Mississippi for the preceding year, with credit modifications for

---

[6]The chancellor said in her order that "For Arrowood to delay [the true-up] process due to being 'confused' about the information it was suppose[d] to submit, goes to the very nature of why deadlines are important to the Supreme Court . . . . Arrowood gave [the Windpool] notice that it would not be submitting any new data.  Arrowood made the choice not to respond.  Arrowood made the choice not to ask questions and clear up any confusion."

13

voluntarily writing property with wind coverage on the Mississippi Gulf Coast.

- We invite your special attention to the provision of the Plan of Operation which allows credit for business voluntarily written in the Mississippi Coast Area.

- Any property insurance policies which do not cover the perils of Windstorm and Hail should not be submitted.

- It will be necessary for each member company of the [Windpool] to submit a bordereau listing all property insurance written which covers the perils of Windstorm and Hail . . . .

¶25. But we disagree that any of these statements provided information that would cast doubt on the Windpool's original answer to Arrowood's question. To be sure, none of the statements specifically echo the information in the Windpool's attorney's opinion, but neither do any of the statements contradict that opinion. Indeed, all of the statements appear either to provide *less* information than, or specifically refer to, the governing statutes and Windpool's Plan of Operation that led to Arrowood's inquiry in the first place. In short, we see nothing in these letters that would alert a member that excess policies are a basis for voluntary-writings credit, when that member previously had been told the opposite. Accordingly, we reject the Windpool's argument that "[a]ny mistaken information that may have existed as a result of the September 29, 2005 facsimile was corrected in the August 12th and October 25th letters."

¶26. In sum, we find that all of the elements of negligent misrepresentation are present here. The Windpool incorrectly represented to Arrowood that it could not receive credits for excess policies, and that representation certainly was material. The Windpool's decision to

14

reply to Arrowood with an erroneous attorney's opinion evidences a lack of that "degree of diligence and expertise" that the public is entitled to expect of the Windpool. As discussed above, Arrowood reasonably relied on the Windpool's representation, and it certainly suffered damages when it failed to get credit for voluntarily writing wind and hail policies on the Coast. While we agree with the Commissioner that this Court said in *Union National* that the Windpool has the authority to allow true-ups, to set deadlines and to enforce those deadlines, we did not say that those deadlines were immutable and were not subject to other mitigating principles of law. As such, we find that the Windpool's misrepresentation tolled its deadline as to Arrowood. We therefore reverse the decisions of the Commissioner and the Hinds County Chancery Court.

## CONCLUSION

¶27. For the foregoing reasons, we reverse the decisions of the Insurance Commissioner and the Hinds County Chancery Court and remand this case to the Insurance Commissioner for proceedings as necessary, consistent with this opinion.

¶28. **REVERSED AND REMANDED.**

**RANDOLPH, P.J., KITCHENS, KING, MAXWELL AND BEAM, JJ., CONCUR. DICKINSON, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J. COLEMAN, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. WALLER, C.J., NOT PARTICIPATING.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

15

¶29. Because I maintain my view that the Windpool possesses no statutory authority to promulgate a statute of limitations for the true-up process,[7] I do not join the majority's tolling analysis but agree the Windpool had no right to refuse to accept Arrowood's refiled premium data.

**COLEMAN, J., JOINS THIS OPINION**.

---

[7] *Miss. Windstorm Underwriting Ass'n v. Union Nat'l Fire Ins. Co.*, 86 So. 3d 216, 231–32 (Miss. 2012) (Dickinson, P. J., dissenting).